# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

BRENDA CARTER,

     **Plaintiff,**

v.                             **2:11cv665**

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,

     **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Brenda Carter seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. Specifically Carter claims the ALJ's conduct at the administrative hearing denied her due process. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. Because Carter's hearing complied with due process and the Commissioner's findings are supported by substantial evidence, this report recommends that the final decision of the Commissioner be affirmed.

## I.     PROCEDURAL BACKGROUND

On May 14, 2008, Carter filed an application for SSI, alleging disability beginning July 31, 2006, due to back injury and epilepsy. (R. 60-67, 96). The Commissioner denied her application initially (R. 25-27), and upon reconsideration. (R. 29-31). Carter requested an administrative hearing (R. 32), which was conducted on May 19, 2010. (R. 303).

1

Administrative Law Judge ("ALJ") Barbara Powell concluded that Carter was not disabled within the meaning of the Social Security Act, and denied her claim for SSI. (R. 10-22). The Appeals Council denied review of the ALJ's decision (R. 5-8), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), on December 19, 2011, Carter filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court for disposition of the parties' cross-motions for summary judgment.

## II.    FACTUAL BACKGROUND

Carter was born on May 7, 1957 (R. 60), and has a college education. (R. 100, 307). She testified that she is 5'7" and weighs 214 pounds. (R. 307). Carter was employed as a patient escort from 2004 to 2006. (R. 84). The job involved transporting patients on stretchers or in wheelchairs, as well as assisting them to and from beds. (R. 85). This required Carter to walk or stand eight hours a day. Id. In July 2006, an 850 pound patient fell on Carter and injured her. (R. 307-08). Carter alleges she has had chronic lower back pain and a reoccurrence of petit mal seizures since the accident in 2006. (R. 309).

Carter's motion for summary judgment, however, primarily contends that her hearing before the ALJ violated her due process right to a full and fair hearing, because the ALJ's conduct at the hearing evidenced a bias against her. (ECF No. 9). Additionally, and secondarily, Carter argues that the ALJ improperly evaluated the evidence bearing on her RFC by not giving proper weight to a treating physician's opinion and by finding Carter's own subjective evidence not credible. Id. at 16-18.

2

## A. Conduct of the Hearing

Carter's brief primarily relies upon excerpts of the ALJ's comments during the hearing related to previous postponements to the hearing date. Originally, a hearing date was scheduled for October 28, 2009 in New Castle, Delaware. (R. 40). After Carter brought to SSA's attention that the proper location for her hearing was Salisbury, Maryland, SSA rescheduled the hearing the first time for November 25, 2009 in Salisbury. (R. 299). The November 25 hearing was also cancelled, however, because the ALJ was unavailable on that date. Id. SSA then rescheduled Carter for a hearing on February 8, 2010 in Salisbury, but this hearing was later postponed due to inclement weather. Id. At the hearing on May 19, 2010 it appears that the ALJ may have misunderstood the cause of the repeated delays.

Midway through the hearing while in the midst of examining Carter, the ALJ casually brought up the delays in Carter's case. (R. 316). In a comment unrelated to the subject of her inquiry the ALJ noted the several delays and referred to Carter as "something of a record-setter." (R. 317). The ALJ then inquired about the cause of the postponements, to which Carter responded that she had no idea, but alluded to inclement weather as a cause. Id. The ALJ replied "[n]ow don't tell me you don't have any idea," and "[t]he weather? Oh, Ms. Carter." Id. She continued, noting the expense and time associated with re-scheduling a hearing. Id.

Carter's counsel then attempted to interject on Carter's behalf, but the ALJ responded that she was typing and would get back with him. Id. Carter then attempted to speak, but the ALJ cut her off and stated, "Now, now please -- now whoa, whoa, Ms. Carter." Id. The ALJ continued, "I'm being very generous in, in letting you talk, but usually I ask the question and you're -- please, if you've ever been to court before, give me the same courtesy you would give

3

to a federal judge . . . and wait to ask if you can speak." (R. 318). The ALJ then went on a brief tangent noting that there are more than 750,000 people waiting for hearings, and that she is under a lot of pressure from administrators to hear and decide these cases quickly. Id. To this point, the ALJ declared, "I get nasty notices from the administrators about: why are you holding that case up? And then I get to write a novel on why I'm not holding the case up." Id.

The hearing then resumed and proceeded normally with Carter's counsel examining Carter. (R. 319-22). The Vocational Expert testified next, and the ALJ presented her with three hypotheticals. (R. 323-26). Carter's counsel then examined the Vocational Expert and presented a hypothetical that appeared to be the same as the ALJ's third hypothetical. (R. 325-26, 329-30). When the ALJ brought this to counsel's attention, he stated that he was trying to emphasize the RFC limitations found by Dr. King, a treating physician. (R. 330). He then acknowledged that the ALJ's last hypothetical had also encompassed Dr. King's findings. Id.

The ALJ then observed, if there was nothing further, she would close the hearing because she was already behind schedule. Id. In concluding, the ALJ stated that she found the hearing to be meaningful and "really appreciate[d] everybody's cooperation and candor in the hearing." Id. She further disclosed "I do not know how I'm going to decide the case." Id. Then, after she thanked counsel for doing an excellent job, counsel attempted to readdress the ALJ's apparent misunderstanding concerning the delay issue. (R. 331). The ALJ replied, "I don't see what that could possibly have to do with the determination of the case." Id. She again reiterated that she is under pressure to hear the cases quickly. Id.

Counsel again attempted to speak, at which point the ALJ cut him off and instructed him on the concerns of rescheduling hearings due to the costs and number of applicants waiting. (R.

4

331-32). As a part of this discourse, the ALJ made a seemingly unrelated reference that a representative does the client no favor by asking for a continuance. (R. 332-33). She went on, apparently referring to another matter entirely, "she was really out of line to have asked for such a thing, and she did not get a postponement. The way I was brought up, the law school I went to, a court hearing date, you know that's pretty critical. As you feel the same way." (R. 333). After a brief acknowledgment by counsel that he felt the same, the ALJ noted she had been hearing cases all day and needed to move on to the next hearing. Id.

The day after the hearing, Carter's counsel wrote a letter to the ALJ noting his objection to the conduct of the hearing. (R. 138-39). There is no evidence that the ALJ responded to the letter, and she issued her decision approximately three weeks later on June 25, 2010. (R. 10-22). Carter appealed the ALJ's decision to the Appeals Council, contending that the conduct of the hearing denied her due process. (R. 296-302). The Appeals Council referred some of Carter's allegations for a separate review, but affirmed the ALJ's decision on the merits. (R. 6).

## B. Evidence Before the ALJ

The Record indicates that Carter first received treatment at Eastern Shore Rural Health, Inc. in February 2008. (R. 147-48). She was seen by Dr. Jeanne Roll, and reported having lower back pain and a rash. (R. 148). She informed Dr. Roll that she was on Oxycodone and Flexerill for her back, and Dr. Roll prescribed one month of Oxycontin and refilled the Flexerill. Id. After the visit, Dr. Roll contacted Carter's prior physician, Dr. Lambert, who informed Dr. Roll that she had seen Carter only a couple of times in the six months before Carter moved to Virginia. (R. 147). Dr. Lambert further informed Dr. Roll that Carter had a number of chronic pain complaints, but showed no significant degenerative joint disease. Id. Dr. Lambert further

suggested that Carter be weaned off narcotics. Id.

Carter revisited Dr. Roll in April 2008, and again reported chronic pain and the need for a narcotics refill. (R. 144). She reported that she was currently unemployed but was investigating getting a job in central surgical supply. (R. 145). She told Dr. Roll that she had a history of petit mal seizures from ages five to twenty-two and had experienced a grand mal seizure seven years ago when her grandmother died. (R. 144). She also stated that in 2006 she had an EEG at Kennedy Hospital in Stratford which was normal. Id. Carter reported a pain level of 8-10, but Dr. Roll noted that she was not clinically in that degree of pain. (R. 145). Dr. Roll advised Carter that she would help with the pain, but presented a narcotics contract to Carter after learning Carter had taken five Percocet pills from her husband's bottle. Id.

A week later Carter had a follow-up visit with Dr. Roll. (R. 142). Dr. Roll noted it had been "an interesting week medication-wise for Ms. Carter." Id. Dr. Roll talked to the pharmacist who filled Carter's Percocet prescription and was informed that Carter had complained to the pharmacy that she only received twenty-seven pills, not thirty. Id. Carter told Dr. Roll that she had to repay some pills to her husband's bottle, and that she was taking two pills a day instead of one due to pain. Id. Dr. Roll issued another prescription with the guideline that Carter take no more than two pills per day. (R. 143). Again Carter reported a pain level 8-10, but Dr. Roll noted that she was not clinically in this degree of pain though she evinced more pain-like behavior in this visit. (R. 142). Dr. Roll diagnosed Carter with a verifiable low back pain and limited ankle reflex. Id. She recommended Carter get a CT or MRI. (R. 142). In May 2008 Carter made her final visit to Dr. Roll, where she again reported an 8-10 pain level, but said she was doing better with Percocet. (R. 141).

Carter checked herself into an emergency room on June 25, 2008 due to sharp pain and spotting following an embryo implant procedure. (R. 152). While there, her pain improved and spotting stopped. Id. She was discharged and allowed to drive herself home. Id. Carter was treated in the emergency room on two other occasions in 2008. In August 2008 Carter sought assistance due to a swollen left foot that was diagnosed as a muscle strain. (R. 173-80). Then, in October 2008 she entered the ER due to severe lower back pain. (R. 181-88). During this visit, Carter requested a note for her August 2008 ankle injury to clear her from work. (R. 186).

In August 2008, Carolina Longa, M.D., a physician consultant, reviewed Carter's records and completed a Physical Residual Functional Capacity Assessment. (R. 165-72). Dr. Longa opined that Carter was capable of performing medium work which required her to lift and/or carry no more than fifty pounds occasionally and twenty-five pounds frequently; sit and stand and/or walk about six hours each in an eight-hour workday; with no climbing, but allowing for other postural activities occasionally or frequently. (R. 167-68). She also had to avoid all exposure to hazards (e.g., machinery and heights). (R. 169). Dr. Longa found Carter's statements concerning her symptoms and their effects partially credible, and noted that her back pain had improved and there was no indication of any recent seizures. (R. 172).

Carter began seeing Dr. Rosa King as her primary care physician in July 2008. (R. 218). Dr. King found that Carter had chronic back pain and was positive for left straight leg raising. Id. She concluded that Carter's obesity contributed to her back pain, and suggested a ten-percent weight loss and prescribed Oxycodone. (R. 217). Dr. King advised Carter that she does not manage chronic pain medications and referred Carter to a specialist for diagnosis and treatment options. Id.

In September 2008, Carter saw Dr. John J. Greco of Peninsula Orthopaedic Associates and complained of left leg pain and back pain. (R. 198). Dr. Greco observed no structural abnormalities with only moderate restriction of range of motion of the lumbar spine. Id. He further found that Carter was negative for left straight leg raising, and an x-ray showed no significant degenerative arthritic changes. Id. He suggested that Carter start physical therapy, get an MRI, and receive lumbar epidural steroid injections. Id.

Carter next visited Dr. King on September 22, 2008. (R. 214). Dr. King recommended that she continue to see Dr. Greco, start physical therapy, get an MRI, and see a neurologist about her seizures. Id. Dr. King also discussed the need for a specialist to perform the pain control treatment. Id. On October 22, 2008, Carter had a follow-up visit and informed Dr. King that she was working part-time and needed a note to return to work. (R. 211). Dr. King wrote a note stating that Carter could return to work "without restrictions." (R. 212). She also restarted Carter on Tegretol for her seizures. (R. 211).

An MRI conducted on October 31, 2008 found small Tarlov cysts in Carter's sacrum but her discs were unremarkable with no stenoses. (R. 224). Carter was then referred to physical therapy for pain management. (R. 206). However, she never attended after a notification of the appointment was sent to her but returned due to a wrong address. Id.

In January 2009 Carter visited the emergency room complaining of lower abdomen pain. (R. 253). A CT of her abdomen was negative, but a CT of her pelvis identified multiple calcified uterine fibroids. Id. A few days later Carter had an initial evaluation at Mosher Physical Therapy. (R. 255). Mosher developed a plan for Carter to attend physical therapy two times a week for a period of three weeks. (R. 257). Carter did not follow through on the plan, however, due to a

family illness. (R. 261).

In March 2009, Leopold Moreno, M.D., a physician consultant, reviewed Carter's file and completed a Physical Residual Functional Capacity Assessment. (R. 226-32). Dr. Moreno stated Carter was capable of performing work with the following limitations: she could lift and/or carry no more than fifty pounds occasionally and twenty-five pounds frequently; sit and stand and/or walk about six hours each in an eight-hour workday; and perform no climbing but could perform other postural activities (i.e., balancing, stooping, kneeling, crouching, and crawling) frequently. (R. 227-28). She also had to avoid even moderate exposure to hazards (e.g., machinery and heights). (R. 229). After evaluating the medical records, Dr. Moreno found Carter's statements about her symptoms and their effects partially credible. (R. 231). Dr. Moreno based this on two key pieces of evidence in Carter's records. First, Dr. Moreno noted that "[a]lthough she states she had multiple petit mal seizures in 12/08, when she went to her TP on 12/17/08, none were reported." Id. Next, he cited Dr. King's October 22, 2008 report which noted that Carter could return to work without restrictions, and found this report to be consistent with the other medical evidence of record and, thereby, accorded it controlling weight in forming his assessment. (R. 231-32).

In October 2009, Dr. King conducted a Medical Evaluation Report of Carter, and summarized Carter's impairments as chronic low back pain, decreased range of motion of the left hip, and petit mal seizures. (R. 233). Dr. King noted, however, that the seizures had been diagnosed by prior physicians, not herself. (R. 237). She concluded that these impairments prevented Carter from working full time, and that Carter was only capable of sitting for two hours and standing and/or walking for one hour in an eight-hour workday. (R. 234). Dr. King

9

further remarked that while Carter could perform simple grasping, she could not perform pushing or pulling, nor fine manipulations. Id. Additionally, Carter was completely restricted from unprotected heights, machinery, and driving automotive equipment, and moderately restricted from exposure to marked changes in temperate and humidity and exposure to dust, fumes and gases. (R. 235). Dr. King expected the impairments to last over twelve months, and the prognosis for recovery was poor. Id. As a result, she found Carter had an inability to maintain regular employment. (R. 236).

Carter first visited Dr. Edwin Bellis, a pain specialist, in February 2009. (R. 262-95). On her intake form, Carter stated that her pain was constant and piercing at level 10, though she noted that pain medications relieved roughly eighty percent of the pain. (R. 275-76). Dr. Bellis reported than an MRI of Carter's lumbar spine was "absolutely normal." (R. 271). Additionally, an x-ray of Carter's pelvis in March 2009 revealed minimal pelvic tilt and possible calcified fibroids. (R. 295). Dr. Bellis prescribed pain medication for Carter, but made several notations about possible issues related to Carter's pain medication use. (R. 284-92). In May 2009 Dr. Bellis performed a fluoroscopically guided injection of Carter's right and left sacroiliac joints after finding she had painful SI sacroiliac joints. (R. 267). Carter continued her pain treatment with Dr. Bellis through the hearing date. (R. 315).

At the hearing, Carter testified that she is disabled and unable to work because of lower back pain and petit mal seizures. (R. 309-10). Carter stated she also suffers pain in her shoulders and neck, and gets spasms which can cause her legs to give out on her. (R. 310). She testified that she takes several medications, which make her groggy. (R. 313-14, 320). Carter also stated that she struggles to sleep due to the pain, and has to use a cane to ambulate. (R. 319-20).

10

Carter lives with her husband who also claims he is disabled. (R. 61-62, 307). She testified that her husband does most of the cooking and laundry, because she cannot cook on a stove-top due to her petit male seizures and is too weak to lift laundry. (R. 311). She stated that though she is able to drive, she has to use an electric scooter when grocery shopping. Id. She also testified that due to pain she sleeps a lot during the day and continues to have petit mal seizures which cause her to black out. (R. 319, 322).

### III.    STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence,

11

are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

### A. ALJ's Actions Did Not Violate Due Process

Carter asserts that the hearing before the ALJ violated due process, because it was not fair and the ALJ was biased against her. (ECF No. 9 at 10-18). Defendant argues that Carter received a full and fair hearing which complied with due process requirements. (ECF No. 11 at 13-16). Judicial review of bias claims is proper in a § 405(g) proceeding. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

Procedural due process applies to administrative hearings as it does in judicial proceedings. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Gibson v. Berryhill, 411 U.S. 564, 579 (1973). "'A fair trial in a fair tribunal is a basic requirement of due process.'" Withrow v. Larkin, 421 U.S. 35, 46 (1975) (quoting In re Murchison, 349 U.S. 133, 136 (1955)); see also Richardson, 402 U.S. at 400-01 (noting that in social security cases there must be a fair hearing and the procedures must be "fundamentally fair"). "[A]n impartial decision maker is an essential element of due process." Bowens v. N.C. Dep't of Human Res., 710 F.2d 1015, 1020 (4th Cir. 1983) (citing Goldberg v. Kelly, 397 U.S. 254, 271 (1970)).

Due to the active role of ALJs in social security cases, impartiality is particularly important, and ALJs must "develop a full and fair record." Ventura, 55 F.3d at 902. Thus, "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with

12

respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 404.940 (2011). However, administrative decision makers are entitled to the same "presumption of honesty and integrity" as judicial decision makers. Morris v. City of Danville, 744 F.2d 1041, 1044 (4th Cir. 1984) (citing Withrow, 421 U.S at 47). To disqualify a decision maker as personally biased, the bias must originate from a source independent from the decision maker's participation in the case. Bowens, 710 F.2d at 1020 (citing United States v. Grinnell Corp, 384 U.S. 563, 583 (1966)). "Furthermore, 'actual bias or a high probability of bias must be present before due process concerns are raised.'" Simpson v. Macon County, N.C., 132 F. Supp. 2d 407, 411 (W.D.N.C. 2001) (quoting Marshall v. Cuomo, 192 F.3d 473, 484 (4th Cir. 1999)).

Carter cites to cases which support her position that a biased or partial ALJ violates due process. (ECF No. 9 at 10-13). However, the cases which have found that the ALJ's conduct deprived the social security claimant of a full and fair hearing involved facts very different from Carter's complaints.

While the ALJ's tone and conduct in Carter's hearing could properly be characterized as intemperate, even rude, the Record does not support any inference of bias or partiality sufficient to impinge Carter's right to due process. The Court does not question that some comments, viewed in isolation, were impolite and unwarranted. These comments, however, comprise a small part of the hearing Record, and none of the comments taken individually or collectively evidence bias against Carter's claim of disability. The ALJ's comments about the trial delays, when viewed in totality, reveal her belief that ALJs are under pressure to promptly hear and dispose of cases. While she apparently mistakenly attributed the cause of delays to Carter, she clearly expressed that the trial delays were irrelevant to her determination of the case. (R. 331).

Additionally, at the end of the hearing the ALJ told Carter and her counsel that she found the hearing meaningful and "appreciate[d] everybody's cooperation and candor in the hearing." (R. 330). In total the comments prompting criticism comprise less than four pages of a thirty page transcript. Throughout the rest of the hearing the ALJ carefully examined Carter concerning her symptoms and their effect on her ability to work. She was not dismissive or otherwise critical of her symptoms or claims.

Further, while the ALJ's extraneous comments about attorneys continuing hearings to take trips to Washington D.C. were unnecessary and irrelevant, they do not suggest that the ALJ was biased against Carter or her counsel. The ALJ's statement to Carter's counsel "[a]s you feel the same way" suggests that the comments did not reflect that the ALJ believed Carter's counsel had done this. R. 333. Rather, the comments recount a prior experience with different counsel and appear to be part of the ALJ's ongoing observation about her professed desire to move cases quickly through the SSA system. The ALJ's clearly unnecessary comments may reflect poorly on her. They do not, however, establish any bias or partiality against Carter. Consequently, the undersigned finds that the ALJ was not biased against Carter, and thus, Carter was not denied her due process right to a fair hearing.

**B. Disability Claim**

Having complied with due process, the ALJ's decision should be sustained if her analysis complies with the law, and is supported by substantial evidence. To be eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirements in 42 U.S.C. §§ 1382(a) and (b), must also satisfy the basic eligibility and definitional requirements for disability found in 42 U.S.C. §§ 1381(a) and (c).

The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted and can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The

15

burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

### 1. ALJ's Decision

In this case, the ALJ made the following findings under the five part analysis: (1) the ALJ found that Carter had not engaged in substantial gainful activity since May 14, 2008 (the application date); (2) Carter had severe impairments of petit mal seizures, degenerative disc disease of the lumbar spine, and obesity; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; (4) Carter had the RFC to perform medium work, with specified limitations to avoid dangerous heights and machinery, ladders, ropes, scaffolds, concentrated exposure to heat, humidity changes, gases, fumes, and vibrations. Finally, although the ALJ concluded that Carter could not perform her past relevant work, she did identify jobs which exist in substantial numbers in the national economy which Carter could perform. (R. 15-21).

In her motion for summary judgment, Carter primarily addresses the due process complaints already addressed. But she also argues that the ALJ erred in determining her RFC. Specifically, she claims that the ALJ: (1) failed to give proper weight to the opinion of one of her

treating physicians, Dr. King; and (2) did not support with substantial evidence her finding that Carter's testimony was "not credible." (ECF No. 9 at 16-18; No. 12 at 10-12). The Court considers each argument in turn.

## 2. The ALJ Properly Evaluated the Evidence Bearing on Carter's RFC

While Carter does not directly address the merits, her arguments effectively contend that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform her past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at § 404.1545(a)(5)(iii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[1] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements'–i.e., opinions about what the individual can still do despite his or her impairment(s)–submitted by an

---

[1] "Other evidence" includes statements or reports from the claimant, the claimant's treating and nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Carter has the RFC to perform a reduced range of medium work. (R. 20).

### a. The ALJ properly explained the weight assigned to medical opinions

Carter contends that the ALJ erred by assigning "little weight" to the opinion of Dr. King, her treating physician. (R. 20). Carter essentially argues that since Dr. King was her primary treating physician, her testimony should have been accorded more weight than the other physicians. (ECF No. 9 at 16-17).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

18

Because regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations.]" SSR 96-2p, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for her decision. Id. at § 404.1527(d)(2).[2]

In her decision, the ALJ found, after "careful consideration of the entire record," that Carter is capable of performing medium work as defined in 20 C.F.R. 416.967(c). (R. 17). In making the RFC determination, the ALJ provided a review of Carter's treatment record including the records of treating physicians Dr. King, Dr. Greco, and Dr. Bellis. (R. 19-20). In her decision, the ALJ discussed Dr. King's evaluations at length. The ALJ noted that prior evaluations by Dr. King and Dr. Greco conflicted with Dr. King's October 2009 evaluation report which suggested "extremely restrictive limitations" for Carter. (R. 19-20). The ALJ accorded greater weight to Dr. King's October 2008 report, as well as the findings made by Dr. Greco and Dr. Bellis. (R. 20). Those reports found that Carter could return to work without restrictions (R. 212), suffered slightly restricted range of motion in the lumbar spine with mild diffuse tenderness (R. 190), had minimal pelvic tilt (R. 295), and possible calcified fibroids. (R. 295). The ALJ determined that the evidence of record was consistent with these reports, and that Carter could perform medium work with limitations. (R. 20).

The ALJ explicitly accorded "little weight" to Dr. King's October 2009 assessment that

---

[2] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(iii).

Carter suffered from chronic lower back pain, decreased range of motion of the left hip, and petit mal seizures, such that she could only sit for two hours and stand and/or walk for one hour a day in a work setting and had an inability to return to full time work. (R. 19-20). In so doing, the ALJ noted that Dr. King had not observed any seizures and that they were diagnosed by prior physicians. (R. 20). Additionally, the ALJ found that no medical records substantiated the prior diagnosis of petit mal seizures. Id. The ALJ, therefore, determined that Dr. King "based her diagnosis on the claimant's say so without corroboration." Id. Thus, she concluded that Dr. King's October 2009 opinion that Carter's limitations precluded full time work of any kind was not supported by the record. Id.

In her motion for summary judgment, Carter essentially asks the Court to overturn the decision of the ALJ and assign more weight to Dr. King's October 2009 assessment, which is more favorable to her claim for SSI. Having reviewed the ALJ's report and the reasons articulated in that report, the Court finds that the ALJ supplied "good reasons" for not giving "controlling weight" to Dr. King's October 2009 opinion. Dr. King's opinion that Carter suffered from petit mal seizures was based solely on prior diagnoses by other physicians and is not supported by any medical evaluations in the Record. Moreover, Dr. King's October 2009 findings are inconsistent with her own findings in October 2008 as well as with other evidence in the record, including the findings of Dr. Greco and Dr. Bellis. The ALJ concluded that Dr. King's 2008 findings were more consistent with the other evidence in the record, including the observations of the two State agency consultants. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." Craig, 76 F.3d at 589. Dr.

King's October 2009 opinion that Carter is severely limited is contradicted in the record by the opinion of other treating physicians and other medical evidence of record. The ALJ did not err by refusing to give her opinion controlling weight. Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991).

### b. The ALJ correctly evaluated Plaintiff's complaints of pain

Carter next argues that the ALJ did not properly support her finding that Carter's subjective complaints of pain and limitations were "less than fully credible." (R. 19). In step four of the analysis, the ALJ determined that "[a]fter careful consideration of the evidence, the undersigned finds that [Carter's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Carter's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id. The ALJ specifically found that the treatment records do not reflect the degree of limitations alleged by Carter.

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a). A plaintiff's subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could

21

cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3). In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id.

Although Carter satisfied her threshold burden under the two-step inquiry set forth in the regulations and adopted by the Fourth Circuit, the ALJ found that Carter's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible"

inasmuch as they are inconsistent with the record, and determined her testimony "less than fully credible," because "the objective medical evidence does not support that these conditions are disabling." (R. 19). In so finding, the ALJ considered the entire record and documented her review in detail in the opinion. The Court finds that the ALJ complied with both the regulations and Fourth Circuit precedent in evaluating Carter's pain, and supported her decision with substantial evidence.

To the extent Carter contends that the ALJ erred in evaluating her credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstance.'" Id. (quoting NRLB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NRLB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)). Here, the ALJ performed the required analysis and articulated a number of reasons for not fully crediting Carter's statements. The ALJ's conduct at the hearing does not provide an exceptional circumstance as Carter contends. There is ample objective evidence in the Record to contradict Carter's testimony and support the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated Carter's credibility.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment, DENY the Plaintiff's motion for summary judgment, and affirm the final decision of the Commissioner.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.     A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 16, 2012

24

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

        John Edward Basilone
        Goss & Fentress
        753 Newtown Rd.
        Suite 100
        Norfolk, VA 23502

        Kent Pendelton Porter
        U.S. Attorney's Office
        101 W. Main Street, Suite 8000
        Norfolk, VA  23510

                        Fernando Galindo, Clerk

By      _____
            Deputy Clerk

            _____, 2012